Filed 9/21/18; pub. order (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL E. BARRI et al., | |
| Petitioners, | |
| v. | G054838 |
| THE WORKERS' COMPENSATION APPEALS BOARD, | O P I N I O N |
| Respondent. | |

Original proceedings; petition for writ of mandate.  The petition is denied.

Bartlit Beck Herman Palenchar & Scott, Glen E. Summers and Alison G. Wheeler; Silverman & Milligan and Stephen A. Silverman for Petitioners.

Christopher Jagard, Chief Counsel, Department of Industrial Relations Office of the Director, Legal Unit, and Kim E. Card for Respondent.

Michael E. Barri (Barri), Tristar Medical Group (Tristar), and Coalition for Sensible Workers' Compensation Reform (CSWCR) petitioned this court pursuant to Labor Code section 5955 (all further statutory references are to the Labor Code, unless otherwise indicated). They seek a peremptory or alternative writ of mandate, prohibition, or other appropriate relief directing the Workers' Compensation Appeals Board (WCAB)[1] to perform its duties and adjudicate Tristar's lien claims and not enforce certain unconstitutional provisions contained in newly enacted anti-fraud legislation. (§§ 4615 & 139.21.)

In 2016, the Legislature created two new statutes to address a financial crisis plaguing the workers' compensation system, however, the remedy came at a significant cost to all participating medical providers and related entities. Specifically, the new anti-fraud scheme cast a very broad net to halt all proceedings relating to any workers' compensation liens filed by criminally charged medical providers (charged providers), as well as any entities "controlled" by the charged provider (noncharged entities). The Legislature created this new scheme because existing laws permitted charged providers to collect on liens while defending their criminal cases, allowing continued funding of fraudulent practices. Pursuant to these two new statutes, the Government gained authority to automatically stay liens filed by charged providers and noncharged entities, without considering if the liens were actually tainted by the alleged illegal misconduct. (§ 4615.) As a result, untainted liens may be stayed (and go unpaid) for a lengthy stretch of time because, in addition to the period required for completion of the criminal case, the statute provides for two post-conviction evidentiary hearings. In the first hearing, the administrative director decides whether to suspend the convicted provider from further participation in the workers' compensation system. (§ 139.21,

---

[1] In this opinion, we will refer to the WCAB, represented by the Department of Industrial Relations (DIR), Office of the Director, Legal Unit, as the Government (unless the context requires otherwise).

subd. (b).)  Following this hearing, the "special lien proceeding" attorney identifies and gathers liens to be adjudicated together by a workers compensation judge (WCJ) in a consolidated "special lien proceeding."  (§ 139.21, subd. (e)(2).)  In this second hearing, the lienholder has the evidentiary burden to rebut the statutorily mandated presumption the consolidated liens are all tainted by the misconduct and should not be paid. (§ 139.21, subd. (g).)

In their petition, Barri, Tristar, and CSWCR[2] maintain these statutory provisions go too far and are forcing many legitimate lien providers to stop treating injured workers because the process has become too onerous, expensive, and financially risky.  They maintain the creation of a "significantly delayed post deprivation hearing," the over-inclusive application to untainted liens, and the Government's failure to provide adequate notice to noncharged entities, has effectively dismantled the safety net in place for injured workers.  They suggest the true legislative purpose of the statutes goes beyond fraud prevention and serves the district attorney's desire to financially cripple criminally charged lien claimants, hampering their ability to adequately defend themselves at trial. Petitioners point out a group of medical providers are currently litigating similar contentions in the United States District Court, Central District of California.  We grant their request to take judicial notice of documents, declarations, and orders filed in *Vanguard Medical Management Billing, Inc. v. Baker,* No. EDCV 17–CV–965– GW(DTBx) (C.D.Cal. 2017) (*Vanguard*).  (Evid. Code, § 452, subd. (e)(1) [judicial notice of any record of "any court of record of the United States"].)

---

[2] Barri has an ownership interest in Tristar, and CSWCR is a nonprofit organization claiming to have an interest in protecting the legal rights and interests of workers compensation providers (such as Barri and Tristar).  The petitioners will be referred to collectively and in the singular as "Barri" (unless the context requires otherwise).

It should not be overlooked that much has transpired since Barri's original petition was filed in April 2017. Some of these developments have changed the nature of the arguments and are worth noting. Specifically, the following events have taken place:

(1) In September 2017, our Governor signed additional legislation to clarify and close some loopholes found in sections 4615 and 139.21. This court requested, and the parties submitted, additional briefing regarding the effect, if any, of this clean-up legislation.

(2) In December 2017, Judge George H. Wu issued a preliminary injunction in the *Vanguard* case, concluding the lien stay provision suffered from two procedural due process problems despite the recent legislative amendments. (*Vanguard, supra,* (C.D.Cal. Dec. 22, 2017) [nonpub. ord.].)

(3) Soon thereafter, the Government modified its website page to notify not only charged providers, but also noncharged entities that had workers' compensation liens "flagg[ed]" and were subject to the section 4615 automatic stay. (<http://www.dir.ca.gov/fraud_prevention/> (as of Aug. 28, 2018).) Additionally, WCJs started scheduling trial/hearings to give lien claimants a more timely opportunity to litigate limited issues regarding the application of section 4615, such as cases of misidentification or mistaken flagging due to lack of the necessary degree of control by the charged provider. Lien claimants are currently not allowed to adjudicate the propriety of the underlying criminal charges or if a lien is tainted by misconduct.

(4) The Department of Industrial Relations Anti-Fraud Unit (AFU), formed at the end of 2016, obtained a new Chief of the Office of the Director, who implemented new procedures at the end of 2017. The AFU now receives notice from WCJs of scheduled lien hearings/trials and its staff may give the WCJs documentation supporting the AFU's "flagging" decision.

(5) Finally, in response to this court's request for additional information, the parties submitted multiple declarations and documents regarding the Government's

4

procedural changes, current hardships faced by lien claimants, the status of several lien hearings in other cases, and recent developments in the *Vanguard* case.

In light of all of the above, we have determined some of Barri's constitutional challenges have been rendered moot. Other new evidence decisively defeats his "as applied" constitutional challenges. Having the benefit of a more complete picture of the issues facing claimants wishing to collect on stayed and untainted liens, it appears the Government has been slow to implement procedures and protocols. While the new system is far from perfect, it cannot be said sections 4615 and 139.21 are unconstitutional. We deny the petition.

## INTRODUCTION

The instant writ petition is an original proceeding in this court. Under section 5955, "[n]o court of this state, except the Supreme Court and the courts of appeal to the extent herein specified, has jurisdiction to review, reverse, correct, or annul any order, rule, decision, or award of the [WCAB], or to suspend or delay the operation or execution thereof, or to restrain, enjoin, or interfere with the appeals board in the performance of its duties but a writ of mandate shall lie from the Supreme Court or a court of appeal in all proper cases." (See also *Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1042-1044 [superior court lacks subject matter jurisdiction over action challenging constitutionality of workers' compensation statute].) "'In restricting any interference with the [WCAB's] decisions or orders to proceedings in the appellate courts, the Legislature has carried out the declared policy of the constitutional provision that the [WCAB] be unencumbered by any but proceedings in the appellate courts.' [Citations.]" (*Abraham v. Workers' Comp. Appeals Bd.* (2003) 113 Cal.App.4th 1082, 1088.) Thus, only this court or the Supreme Court has jurisdiction to review constitutional challenges to a WCAB decision or process.

In these original writ proceedings, there is no procedural history directly underlying this action and our factual record is limited to documents and declarations

5

provided by the parties. In considering the issues, we have reviewed all relevant evidence contemplated by the issues, including facts not existing when the petition was filed. (43 Cal.Jur.3d (2018) Mandamus and Prohibition, § 60, fn. omitted.) "[This] court may properly receive evidence of matters such as might render the litigation moot or the sought writ useless." (*Ibid.*) We have exercised our discretion in these proceedings and accepted as true the facts disclosed in the parties' numerous declarations, to the extent the declarants describe admissible evidence (not hearsay or speculative opinions) and facts not contradicted by other credible evidence. (See *Bruce v. Gregory* (1967) 65 Cal.2d 666, 670-671.)

In addition, both parties have asked this court to take judicial notice of numerous court documents relating to other workers' compensation cases, statutory history, and other related documents. We grant these requests for judicial notice, and on our own motion, we take judicial notice of the most recent version of the Government's website listing liens subject to a section 4615 stay. (<http://www.dir.ca.gov/fraud_prevention/> (as of Aug. 28, 2018).) (Evid. Code, §§ 452 & 459.)[3]

There are well-settled limits to our use of judicially noticed documents, but the parties' briefing indicates some confusion about these rules. "[W]hile courts are free to take judicial notice of the *existence* of each document in a court file, including the truth of results reached, they may not take judicial notice of the truth of *hearsay statements* in decisions and court files. [Citation.]" (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882, second italics added.) It is improper to rely on judicially noticed documents to prove disputed facts because judicial notice, by definition, applies solely to undisputed facts. "[O]nly where the order or judgment

---

[3] Requests for judicial notice dated April 14, 2017, June 28, 2017, July 19, 2017, October 10, 2017, January 10, 2018, and March 26, 2018, and August 1, 2018, are granted.

establishes a fact for purposes of . . . res judicata or collateral estoppel, would the fact so determined be a proper subject of judicial notice." (*Kilroy v. State* (2004) 119 Cal.App.4th 140, 147; see also *Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 90 [and cases cited therein].) "The hearsay rule applies to statements contained in judicially noticed documents, and precludes consideration of those statements for their truth unless an independent hearsay exception exists. [Citation.]" (*North Beverly Park Homeowners Assn. v. Bisno* (2007) 147 Cal.App.4th 762, 778.)

Accordingly, with respect to the *Vanguard* case's rulings, "Judicial notice is properly taken of the existence of a factual finding . . . [by Judge Wu], but not of the truth of that finding. [Citations.] 'A court may take judicial notice of [another] court's action, *but may not use it to prove the truth of the facts found and recited.* [Citations.]' [Citation.] As our Supreme Court explained, judicial notice of findings of fact does not mean that those findings of fact are true; it means only that those findings of fact were made. [Citation.] '"[N]either a finding of fact made after a contested adversary hearing nor a finding of fact made after any other type of hearing can be indisputably deemed to have been a correct finding . . . ."' [Citation.]" (*Steed v. Department of Consumer Affairs* (2012) 204 Cal.App.4th 112, 120-121.)

WORKERS' COMPENSATION ANTI-FRAUD LEGISLATION

In their briefing, the parties provided a detailed overview of the California workers' compensation system, typical lien processing, the misuse of liens prompting new anti-fraud legislation, the key provisions, and the slow evolution of procedures to implement the new provisions. These concepts are critical to understanding and resolving the issues presented in the petition, and therefore, our discussion starts with a review of this background information.

I. *Brief Overview of Workers' Compensation System*

"Article XIV, section 4 of the California Constitution gives the Legislature 'plenary power . . . to create, and enforce a complete system of workers' compensation.'

7

Pursuant to this authority, the Legislature enacted the WCA—a comprehensive statutory scheme governing compensation given to California employees for injuries incurred in the course and scope of their employment. (§ 3201 et seq.)" (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 810 (*Vacanti*).)

"Under this statutory scheme, an employee injured in the workplace may request workers' compensation benefits by delivering a claim form to the employer within 30 days of the injury. (See §§ 5400, 5401.) Benefits include compensation for medical treatment and other services 'reasonably required to cure or relieve [the employee] from the effects of the injury.' (§ 4600; see also § 3207.) The employee may also obtain compensation for medical-legal evaluations necessary to establish his or her entitlement to benefits. (§ 4621.) If the employer's workers' compensation insurer accepts coverage, then the insurer substitutes for the employer and assumes liability for benefits owed to the employee under the WCA. (§§ 3755, 3757.)" (*Vacanti, supra,* 24 Cal.4th at p. 810.)

"The underlying premise behind this statutorily created system of workers' compensation is the '"compensation bargain."' [Citation.] Pursuant to this presumed bargain, 'the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.' [Citation.]" (*Vacanti, supra,* 24 Cal.4th at p. 811.)

II. *The Nature of Workers' Compensation Liens*

"An employer or its workers' compensation insurer may choose to provide medical care to workers through the employer's Medical Provider Network ("MPN"), [citation], its Health Care Organization ("HCO"), [citation], or neither of these. . . . [¶] In certain cases, an employer or its insurer might decline to provide medical treatment to an

injured employee on the grounds that an injury is not work-related or the treatment is not medically necessary.  An injured worker may then seek medical treatment on his or her own, and, if the injury is later deemed work-related and the treatment medically necessary, the employer is liable for the 'reasonable expense' incurred in providing treatment, which may include ancillary services such as an interpreter to facilitate treatment.  [Citations.]  An employer also may be liable for 'medical-legal expenses' necessary 'for the purpose of proving or disproving a contested claim' for workers' compensation benefits, such as diagnostic tests, lab fees, and medical opinions.  [Citation.]"  (*Angelotti Chiropractic, Inc. v. Baker* (9th Cir. 2015) 791 F.3d 1075, 1078 (*Angelotti*).)

"A provider of services—whether for medical treatment, ancillary services, or medical-legal services—may not seek payment directly from the injured worker.  [Citation.]  Nor may a provider seek payment through the filing of a civil action against the employer or its insurer.  [Citation.]  Instead, these providers may seek compensation *by filing a lien in the injured employee's workers' compensation case*.  [Citation.]  The filing of a lien entitles a provider to participate in the workers' compensation proceeding in order to protect its interests.  [Citation.]"  (*Angelotti, supra,* 791 F.3d at p. 1078, italics added.)

"Whether a provider of medical or ancillary services obtains payment on its lien depends on the result reached in the underlying case.  These providers are entitled to payment of their liens if the injured worker establishes that the injury was work-related and that the medical treatment provided was 'reasonably required to cure or relieve the injured worker from the effects of his or her injury.'  [Citations.]"  [¶] Providers of medical-legal services must demonstrate that the expense was 'reasonably, actually, and necessarily incurred,' [citation], 'for the purpose of proving or disproving a contested' workers' compensation claim, [citations].  Medical-legal lien claimants may still obtain payment even if the injured worker does not prevail in the underlying workers'

9

compensation proceeding, provided that the medical-legal expenses are 'credible and valid.' [Citation.]" (*Angelotti, supra,* 791 F.3d at p. 1079.)

"A medical provider whose bill is contested or otherwise unpaid [may] file a lien claim for the costs of his or her services directly with the WCAB. [Citation.] The filing of a lien claim renders the medical provider *a party in interest* to the WCAB proceedings and endows the provider *with 'full due process rights, including an opportunity to be heard.'* [Citation.] 'Because injured workers and their employers are often ready to resolve the worker's claim for indemnity before resolution of claims by lien claimants, the law grants a lien claimant an independent right to prove its claims in a separate proceeding. (§ 4903.4.)' [Citation.] A lien claimant also may initiate an action if the injured worker does not pursue his or her own claim. [Citations.]" (*Chorn v. Workers' Comp. Appeals Bd.* (2016) 245 Cal.App.4th 1370, 1377 (*Chorn*), italics added.)

In summary, a workers' compensation lien represents a mere contingent expectancy in a payment due to the many hurdles a lien claimant must overcome. The claimant must comply with many procedural requirements. There are limitation periods, filing fees, required forms, and supporting materials. (See e.g., §§ 4903.05, 4903.5, & 4903.6.) Additionally, the lien will not be paid unless the claimant successfully proves several necessary facts. (§§ 3300, 3351-3352, & 3600) These statutory conditions require proof the injury arose "out of and in the course of the employment" and was "proximately caused by the employment, either with or without negligence." (§ 3600, subd. (a)(2) & (3).) It must also be established the medical treatment was authorized, reasonable, and necessary. (§ 4600.)

III. *General Processing of Liens*

One declaration submitted by the Government, aptly provides a summary description of how the lien system operates "in practice." Barri does not dispute any of the following information provided by Paige S. Levy, Chief Judge of the California Division of Workers' Compensation (DWC), which is a division of the DIR. As Chief

Judge, she oversees more than 160 WCJs handling cases within the DWC's 24 District offices.

With respect to the issue of how lien claims are typically processed, Judge Levy provided the following information: "Once a lien claimant files a lien in a case, that person or entity becomes a lien claimant "of record" and is listed on the "Official Address Record" ("OAR") for the case. The lien claimant is then entitled to service of all subsequent pleadings and orders in the case. [Citation.] Although listed on the OAR, a lien claimant is technically not a "party" to a workers' compensation case until the underlying case in chief, between the injured worker and the employer/insurer, has either been resolved or abandoned by the applicant. [Citation.]"

Judge Levy explained an injured worker's claim can be resolved by (1) a "'compromise and release' settlement, which is a lump sum settlement that usually does not include any future liability . . . for medical treatment," (2) "'stipulations with request for an award'" which is a different kind of settlement requiring the payment of future medical treatment, or (3) a "'Findings and Award,'" which is a ruling by a WCJ in the worker's favor. Judge Levy indicated settlements/awards address outstanding lien claims "in some manner." She said some liens (EDD payments or for attorney fees) may be resolved in the settlement terms. "In general, however, the system is structured such that medical treatment and related liens are resolved after the underlying case is resolved, in lien conferences and lien trials that occur later. Thus, typically, medical treatment liens are addressed in settlements and awards in the form of a specification that the employer/insurer agrees to pay, adjust, or resolve all outstanding liens."

Judge Levy stated lien claimants request an appearance before a WCJ by filing a form called a "'Declaration of Readiness to Proceed'" (DOR). "When a DOR is filed, and unless a timely objection is received, a calendar clerk will automatically set the case for hearing before a [WCJ] and notice will be sent to all parties. Depending on what [was] indicated in the DOR, the case will be set for a status conference, a lien conference,

11

an expedited hearing, a mandatory settlement conference, etc. Lien claimants are not authorized to file a DOR requesting a lien conference until they are a 'party,' i.e., until the underlying case has resolved. [WCJs] are authorized to set a lien conference at any time on their own motion. (Cal. Code of Regs., tit. 8, § 10770.1, subd. (a).)"

The second way to request a hearing before a WCJ is to file a petition. (Cal. Code Regs., tit. 8, § 10450.) Judge Levy explained, "A [p]etition is a 'request for action' by the [WCJ] (i.e., similar to a motion) which indicates the type of relief requested; other parties have the opportunity to file 'Answers' (oppositions) to the [p]etition. [Citation.] Petitions are not automatically set for hearing, but a [p]etition filed with a DOR would result in the case being set for a conference at which the parties could argue the issues presented in the [p]etition. Like the DOR process, a [p]etition can be filed on any kind of issue. There is no bar on lien claimants who are not yet technically parties from filing a [p]etition. [Citation.]"[4]

Judge Levy offered the following summary of how the "system operates in practice." Following a settlement/award in the worker's case, "one or more lien claimants will file a [DOR] requesting [the WCJ to] set the case for a 'lien conference.' At the lien conference, the defendant/insurer and the lien claimants will attempt to resolve outstanding lien claims. If the parties *cannot settle all of the outstanding liens*, and based on the agreement of the parties or the judge's decision as to how to proceed, the [WCJ] will either take the case 'off calendar,' continue the case to a future lien conference, or set the case for a lien trial. It is very common in workers' compensation cases, and has been for many years, for medical treatment liens to be resolved after the case in chief, and often substantially after the underlying case is resolved. In my

---

[4] Following a conference/hearing, the WCJ issues "minutes of hearing" (MOH) and this ruling may be appealed to the WCAB "either by way of a Petition for Removal, which is used if the challenged order is not a final order, or by way of a Petition for Reconsideration, which is used to appeal from a final order or decision. [Citation.]"

12

experience as both an attorney within the system and in my years as a judge, I observed that it was not unusual for medical treatment liens to be heard years after (even up to 10 years after) the settlement in the underlying case."

IV. *Anti-fraud Legislation*

On the final two days of the 2016 legislative session, the Legislature enacted Assembly Bill No. 1244 (AB 1244) and Senate Bill No. 1160 (SB 1160) (respectively §§ 139.21 & 4615 [the lien stay provision]) to address the problem of fraudulent medical treatment providers collecting payment on their liens. As aptly explained in the uncodified statement of legislative findings and declarations, contained in section 16 of SB 1160:

"(b) Despite prior legislative action to reform the lien filing and recovery process . . . including Senate Bill [No.] 863 in 2012, there continues to be abuse of the lien process . . . by some providers of medical treatment and other medical-legal services who have engaged in fraud or other criminal conduct within the workers compensation system, or who have engaged in medical billing fraud, insurance fraud, or fraud against the federal Medicare or Medi-Cal systems.

"(c) Notwithstanding fraudulent and criminal conduct by some providers of medical treatment or other medical-legal services, those providers have continued to file and to collect on liens . . . while criminal charges alleging fraud within the workers' compensation system or medical billing or insurance fraud or fraud within the federal Medicare or Medi-Cal systems are pending against those providers.

"(d) The ability of providers . . . to continue to file and to collect on liens, while criminal charges are pending against the provider, including through the use of lien for collection assignments, has created excessive and unnecessary administrative burdens for the workers' compensation system, has resulted in pressure on employers and insurers to settle liens that may in fact have arisen from prior or ongoing criminal conduct, has threatened the health and safety of workers who may be referred for or receive medical

13

treatment or other medical-legal services that are not reasonable and necessary, has allowed continued funding of fraudulent practices through ongoing lien collections during the pendency of criminal proceedings, and has undermined public confidence in the workers' compensation system.

"(e)  Therefore, in order to ensure the efficient, just, and orderly administration of the workers' compensation system, and to accomplish substantial justice in all cases, the Legislature declares that it is necessary to enact legislation to provide that any lien filed by, or for recovery of compensation for services rendered by, any provider of medical treatment or other medical-legal services shall be automatically stayed upon the filing of criminal charges against that provider for an offense involving fraud against the workers' compensation system, medical billing fraud, insurance fraud, or fraud against the federal Medicare or Medi-Cal programs, and that the stay shall remain in effect until the resolution of the criminal proceedings." (Stats. 2016, ch. 868, sec. 16.)

Among other provisions, SB 1160 added the lien stay provision, which provides for the automatic stay of any lien "filed by, or on behalf of" a provider of medical treatment services who has been criminally charged with an offense involving fraud.  This new law provides, "The administrative director may promulgate rules for the implementation of this section." (§ 4615, subd. (a).)  The statute also directs the administrative director to "promptly post on the division's Internet [w]ebsite the names of any physician, practitioner, or provider of medical treatment services whose liens are stayed pursuant to this section. (§ 4615, subd. (d).)

At the same time, the Legislature enacted AB 1244, which added section 139.21.  This provision authorized "[t]he administrative director" to suspend any provider of medical treatment from participating in the workers' compensation system if the provider has been convicted of a felony or misdemeanor or misconduct described in section 139.21, subdivision (a)(1)(A)-(C); hereafter, suspension provision).  Section

14

139.21 also described the administrative director's duties in identifying medical providers for suspension, adopting regulations for suspension, notice and hearing requirements, and the procedures that must be followed for the adjudication of any liens of a suspended medical provider. (§ 139.21, subds. (a)(2), (b)(1)-(3), (c), (d), (e).)

Section 139.21, subdivisions (e)-(i), outline the special procedures for the adjudication of liens of a suspended medical provider. Simply stated, if the criminal disposition requires the liens' dismissal then the workers' compensation judges must enter "orders notifying of those dismissals" effective the date of the final disposition in the criminal proceeding. (§ 139.21, subd. (e)(1).) If the criminal disposition fails to specify what should happen to the liens, all pending liens will be consolidated and "adjudicated in a special lien proceeding as described in subdivisions (f) to (i) inclusive." (§ 139.21, subd. (e)(2).)

In September 2016, the Governor signed the anti-fraud legislation (SB 1160 & AB 1244), which became operative on January 1, 2017. At the end of September 2017, the Governor signed additional legislation, Assembly Bill No. 1422 (AB 1422), designed to provide some needed clarification and close some loopholes found in the prior years' anti-fraud legislation. This clean-up legislation (AB 1422) amended the lien stay provision and section 139.21.

The Senate Rules Committee's bill analysis explained AB 1422 was intended to accomplish the following goals: (1) clarify that the suspension provision also applies to a corporate entity controlled by a convicted medical provider; (2) define "controlled entity" as one in which the convicted medical provider is an executive officer or holds an ownership stake of 10 percent or more; (3) further define the types of convictions required for purposes of spending a medical provider from the workers compensation system and dismissing that provider's liens; (4) give the administrator director authority to amend an existing notice of suspension based on new or additional grounds; (5) authorize the administrative director to create regulations that specify

15

grounds for any exemptions to suspension; (6) allow the Chief Judge of the WCAB to designate where the WCAB will conduct lien consolidation proceedings for a suspended medical provider; (7) permit employers to "defer objecting to or paying any bill" submitted by the criminally charged medical provider until the stay is lifted; (8) permit employers to object to bills submitted by convicted medical providers; (9) clarify the timeline for staying liens and that if there is a conviction the medical providers liens shall remain stayed until the lien consolidation proceeding begins; (10) clarify a medical provider is permitted to dismiss a stayed lien and forfeit all sums claimed; (11) clarify a lien consolidation process will not be stayed in the event new or additional criminal charges are filed against a medical provider; and (12) explicitly provide "the administrative director may promulgate regulations for the implementation of the lien stay process." (Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Sen. Bill No. 1422 (2016-2017 Reg. Sess.) as amended Sept. 8, 2017, pp. 2-4.)

The comment section of the Senate Rules Committee's bill analysis provides some insight as to why the anti-fraud legislation was passed and then needed to be cleaned up. "Last year, as part of a larger workers' compensation anti-fraud initiative, the Legislature passed two significant bills[.] . . . Both bills were a response to a series of articles from the Center of Investigative Reporting, which detailed more than $1 billion in fraudulent activity by a variety of medical providers. While all the schemes were different, each had one common feature: the use of the workers compensation lien system to monetize the fraud. [¶] Unfortunately, the timeline for the staying of liens did not conform to [the] timeline for the lien consolidation process. This led to some rather nonsensical attempts by convicted fraudsters to try to collect on their liens before the lien consolidation process provided in AD 1244 was concluded, as the stay due to SB 1160 was lifted as the charges were no longer pending. These dueling timelines created implementation challenges for the regional WCABs." (Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Sen. Bill No. 1422 (2016-2017 Reg. Sess.) as

16

amended Sept. 8, 2017, pp. 2-4.) The committee added there were other issues that arose in the process of implementing this new legislation, such as how employers should address new medical bills from charged or convicted medical providers, and how to address liens that were forfeited as part of a plea bargain or sentence. (*Ibid.*)

"This bill addresses these issues by revising and clarifying the lien staying and dismissal process, codifying existing procedures developed by the WCAB, and bringing the timeliness for both processes into alignment, ensuring that a medical provider who is convicted of fraudulent behavior is unable to use a loophole to pursue liens that should be dismissed under the law." (Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Sen. Bill No. 1422 (2016-2017 Reg. Sess.) as amended Sept. 8, 2017, pp. 2-4.)

Finally, the committee acknowledged in its analysis that the constitutionality of SB 1160 was currently being challenged in a Federal District Court. (Sen. Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Sen. Bill No. 1422 (2016-2017 Reg. Sess.) as amended Sept. 8, 2017, pp. 2-4.) It recognized United States District Court Judge Wu issued a tentative decision in July 2017, regarding a request for an injunction against the lien stay provision. (*Ibid.*) The committee noted Judge Wu requested supplemental briefing and, therefore, it was uncertain if the injunction would be granted. (*Ibid.*) Because litigation was ongoing, the committee concluded the lien stay provision "remains the law of the land." (*Ibid.*)

V. *Constitutional Challenge to New Legislation in Federal Court*

Barri, in his petition, reply, and supplemental briefing ask this court to take judicial notice of numerous documents and orders related to the same federal lawsuit discussed by the Senate Rules Committee. *Vanguard* is an ongoing putative civil rights lawsuit filed by numerous doctors and medical services corporations against the Director of the California Department of Industrial Relations and the Acting Administrative Director of the California Division of Workers' Compensation. Plaintiffs' facial

17

constitutional challenge to the lien stay provision included claims for injunctive and declaratory relief. As mentioned by the Senate Rules Committee, in July 2017 Judge Wu issued a minute order and tentative ruling indicating he would grant the motion for a preliminary injunction regarding the lien stay provision.

The judicially noticed documents show that on October 30, 2017, Judge Wu issued his final ruling, concluding the motion would be granted despite amendments made to the lien stay provision by the recent enactment of AB 1422. (*Vanguard, supra,* (Oct. 30, 2017, No. EDCV 17-965-GW(DTBX)) 2017 WL 6887855.) On December 22, 2017, Judge Wu issued the preliminary injunction order granting, in part, the motion for a preliminary injunction stating the lien stay provision still suffered from several procedural due process problems. (*Vanguard, supra,* (Dec. 22, 2017, No. EDCV 17-965-GW(DTBX)) [nonpub. ord.].)

Specifically, Judge Wu ordered the Department of Industrial Relations to amend its website and include the name of *any* medical provider or lien claimant whose liens are subject to the lien stay provision. (*Vanguard, supra,* (Dec. 22, 2017, No. EDCV 17-965-GW(DTBX)) [nonpub. ord.].) Judge Wu determined the website listed only the names of charged and convicted medical providers and should add the names of noncharged entities with stayed liens. (*Ibid.*)

In addition, Judge Wu concluded the lien stay provision did not provide affected claimants with a hearing either before liens were stayed or afterwards. The preliminary injunction specified the following: "Lien claimants shall be given the opportunity to be heard within any workers' compensation case at a lien conference and/or lien trial, as appropriate under usual WCAB adjudication procedures, if any dispute or question is raised or arises as to whether any lien at issue in the case falls within the provisions of . . . section 4615 such that a stay of the lien is required. The purpose of such hearings . . . shall be solely to prevent the erroneous application of . . . [s]ection 4615 by its own terms, and not for the purpose of allowing any challenge . . . to

18

the propriety of the underlying criminal charges giving rise to the stay, or for the purpose of disputing whether a lien arises from" the misconduct addressed by the criminal charges. (*Vanguard, supra,* (Dec. 22, 2017, No. EDCV 17-965-GW(DTBX)) [nonpub. ord.].)

At the end of April 2018, Judge Wu denied plaintiffs' motion for contempt, made on the grounds the Government was refusing to comply with the preliminary injunction order. (*Vanguard, supra,* (Apr. 26, 2018, No. EDCV 17-965-GW(DTBX)) [nonpub. ord.].) Plaintiffs had complained the Government was implementing new procedures (unknown to the public) while representing to the court that existing procedures were sufficient. (*Ibid.*) They argued it was improper for the WCJ to notify the AFU (a non-party) and WCJs should not consider evidence provided by the AFU. (*Ibid.*) The Government maintained it had complied with the court's order, and involving AFU in the proceedings was appropriate under the circumstances. (*Ibid.*)

VI. *Procedures Available to Claimants with Stayed Liens*

In her declaration, Judge Levy did not indicate whether the procedures she described (the right to file a DOR/petition) would be available options for claimants wishing to challenge the AFU's flagging decision, but whose liens were not yet ripe for adjudication using existing procedures. Based on our review of other declarations in our record, it appears the Government has slowly become more receptive to permitting hearings to resolve these types of issues in a more timely fashion.

In the beginning of these proceedings (July 2017), Barri submitted evidence showing several different noncharged entities had not received advance notice their liens were stayed, WCJs denied their requests to challenge the grounds for staying the liens, and their lien trials were being continued without any opportunity to be heard. For example, Barri submitted orders rendered in a different workers' compensation case where the WCJ acknowledged the "management" privately circulated a spreadsheet, listing the flagged noncharged entities. The list was not accessible to the public. Barri

19

also complained Tristar's lien representatives were having "limited success" settling liens outside of court because most insurers refused to negotiate with Tristar. He added the WCJs would not allow Tristar's representatives to participate in lien hearings and refused to sign stipulations of settlement. The Government did not initially refute this factual account with any documentation relating to this case or other workers' compensation cases. Instead, it argued "theoretically" there existed procedures (listing without analysis nine different statutes/regulations) already in place to address these lien claimants' concerns.

Nearly one year later (March 2018), the Government offered evidence there were really only two possible procedures available to lien claimants wishing to resolve mistakes with their flagged liens. Mi Kim, the AFU's new Chief of the Office of the Director, declared that in addition to informally alerting anyone working at the AFU about a mistake, there were currently "well over 150" notices of hearing "for lien conferences or lien trial on issues related to whether section 4615 applies to a particular lien." Thus, it appears the WCJs at some point began accepting DORs and petitions of claimants seeking to remedy a perceived improperly stayed lien on at least a few limited grounds. She offered three examples of noncharged entities seeking assistance with the AFU, and after their claims were rejected, these entities sought assistance from a WCJ via a lien hearing or trial.

Barri did not refute the Government's evidence showing holders of stayed liens were now able to schedule lien hearings/trials to address their concerns. However, he presented evidence contradicting Kim's assertion the AFU had specific procedures in place or a publicly available mechanism for reviewing its flagging decisions. Michael Alan Rudolph, a physician in Huntington Park, declared he was the victim of misidentification. AFU flagged his liens in the Electronic Adjudication Management System (EAMS), although his name did not appear on the Government's website list of

20

criminally charged providers.[5] Rudolph declared, "When I initially learned that my liens were stayed, there appeared to be no system or procedure to address the fact" AFU made a mistake. Eventually he learned the only way to address the issue was to hire a lien representative to appear in each worker's compensation case that was "at the stage of resolving lien claims." In each case to date, the WCJs have ruled in Rudolph's favor and determined his liens should not be stayed. Rudolph noted this process has created a significant negative economic impact. The expense of having to correct the error for each individual lien claim is expensive and prohibits him from settling pending lien claims out of court.

Barri submitted two declarations providing evidence the scheduled lien conferences/trials were being unnecessarily delayed. These declarations discussed other workers' compensation cases in which WCJs refused to proceed before notifying the AFU, a non-party, about the proceedings. WCJs also continued hearings to give the AFU an opportunity to present evidence supporting its flagging decisions.

One declaration was supplied by Scott Schoenkopf, managing director of Liening Edge. He explained his company provided representatives to pursue the rights of lien claimants through the workers' compensation system. He provided a detailed description of the hardships facing three different lien claimants seeking to correct mistakenly flagged liens. In one case, the noncharged entity did not know the reason why its liens were stayed. The WCJ was unable to disclose the name of the criminally charged medical provider the AFU determined was "control[ing]" the noncharged entity. The second declaration was from Carlyle R. Brakensiek, an attorney who specialized in workers' compensation issues for a lobbying company. She opined many physicians

---

[5]     In June 2017, Kathy Patterson, manager of the EAMS unit explained not all information in the system can be viewed by the public, and some information can only be seen by those with designated access. It was her job to "flag (or code) for liens" identified by the AFU.

were ending their lien treatment practice because enforcement had become onerous, expensive, and risky.

Both parties agreed there was no system in place for WCJs to consider (before completion of the criminal matter) the substantive issue of whether the lien was tainted or adjudicate the criminal misconduct. Whether the stayed lien was tainted by criminal misconduct was an issue to be decided as part of the special consolidated lien trial described in section 139.21, subdivision (e).

VII. *Risks in Delaying Adjudication of Liens*

The parties agreed that typically a workers' compensation lien may go unpaid for many years (in excess of 10 years), depending on the complexity of the injured worker's case. They seem to agree a claimant will have to wait a longer period to receive payment on an untainted stayed lien. Neither party offered evidence indicating the amount of delay.

In the original briefing, the parties did not explain if, or how, payments would be effected if a lien were stayed beyond the passage of time normally expected for liens. Was there any risk a stayed lien would not be paid if the other liens in a worker's case were settled or paid? The parties submitted supplemental briefing and evidence on this issue.

Judge Levy stated there was little risk that collection on a stayed lien would, at some point, become impossible. "In practical terms, and absent unusual or extraordinary circumstances, the answer to this question is no. Workers' compensation insurers are required to create and to maintain appropriate reserves when a claim is filed. After a worker's claim is settled, and assuming a lien is valid under all applicable statutory and regulatory provisions, the insurer has continuing liability to pay outstanding and valid lien claims, and also has an obligation to maintain appropriate reserves to do so. If the insurer were to go insolvent, the California Insurance Guarantee Association (CIGA) would be responsible for those payments."

22

Barri agreed the insurer had a continuing obligation to pay. However, it asserted there would be problems satisfying the statutory requirements due to the passage of time. Brakensiek declared, "When the resolution of a lien claim is significantly delayed, a lien claimant has an increasingly hard time marshalling the evidence needed to prove all the of the claim's elements (i.e., that the treatment was reasonable and necessary; and that the worker's condition resulted from an industrial injury, which includes proof of causation and affected body parts). Those elements often remain unproven when the worker settles the underlying claim, and the lien claimant then has the burden of proving them. [¶] . . . Over time, records needed to prove these elements can be lost, misplaced, destroyed pursuant to HIPAA regulations, inadvertently discarded or recycled; employers and other providers with necessary records go out of business; and witnesses such as the injured worker or third parties such as the primary care physician disappear, retire, or pass away." We note, Brakensiek did not provide any supporting documentation to support her statement records will be lost or destroyed. Barri did not present evidence regarding how much longer a stayed lien will be delayed compared with an un-stayed lien.

<em>CONSTITUTIONAL CHALLENGES</em>

Barri challenges the lien stay provision and section 139.21 on five constitutional grounds as follows: (1) the Sixth Amendment right to counsel; (2) the First Amendment right to petition; (3) the Fourteenth Amendment right to substantive due process; (4) State and Federal right to procedural due process; and (5) the ex post facto clause. We will address each constitutional challenge separately below after providing a brief summary of the undisputed facts underlying Barri's criminal conviction and charges.

I. *Factual Summary*

Barri has been a chiropractor since 1995, and he is the cofounder and a shareholder of Tristar. In March 2016, Barri pleaded guilty to a single count of

23

conspiracy in violation of 18 U.S.C. section 371, for referring patients to Pacific Hospital of Long Beach for back surgeries. Barri declared he had not yet been sentenced, but part of his plea agreement was to pay $206,505 in restitution. On April 3, 2017, Barri was suspended from participating in the workers compensation system as a provider pursuant to section 139.21.

Meanwhile in an Orange County Superior Court, Barri and many other providers were criminally charged in a case concerning a kickback scheme involving medical insurance billing fraud in connection with workers' compensation patients. (*People v. Charbonnet et al.* (Super. Ct. Orange County, 2014, No. 14ZF0334) (*Charbonnet*).) In 2016, this court granted a petition for writ of mandate, directing the trial court to set aside many of the charges in the criminal indictment for procedural reasons. (*Ahmed et al. v. Superior Court* (Mar. 10, 2016, G051473) [nonpub. opn.].) In May 2016, the district attorney re-filed the charges against Barri in a criminal complaint. Barri asserts the charges relate to billing fraud for "transdermal creams" prescribed by providers treating patients at Tristar. No date has been set for trial, and Barri expected the case would be continued for "a year or more." He predicted liens having no connection to the *Charbonnet* allegations will likely be stayed for "a year or longer" until resolution of the criminal case, under the new anti-fraud legislation.

Barri explained, "Tristar operated as a multi-specialty medical group from October 2001 through June 2016. In addition to my chiropractic practice, internists, orthopedic surgeons, neurologists, neurosurgeons, physical therapists, acupuncturists, and other chiropractors served as independent contractors and provided services to Tristar's patients." Barri stated most of Tristar's patients were injured workers with workers' compensation claims, however, the medical group also treated patients for personal injury claims and patients covered by traditional health insurance. In June 2016, Tristar merged into another medical group but remained in business to collect outstanding workers' compensation liens. Barri stated Tristar had 3,060 outstanding workers' compensation

24

liens, valued at over $20 million. He maintained all the liens were filed under Tristar's name, and the filing form in effect until January 2017, did not allow organizational claimants to include the names of individual providers whose services were included in the lien. Thus, many of these pre-2017 liens could relate to medical providers who have no criminal charges pending. In January 2017, after enactment of the anti-fraud legislation, the Government implemented a new lien filing form that required organizational lien claimants to list the names and identifying information of providers. These liens will identify Barri, however, he asserts none of those liens arises from or has any connection to the conduct described in the criminal proceedings.

Barri declared, "Tristar's liens provide my sole source of income." He stated if the liens were stayed, he would no longer be able to pay his family's living expenses or his criminal defense attorney in the *Charbonnet* case. In addition, Tristar's only cash flow would "effectively be cut off," and it would be unable to pay lien filing fees on pending claims for services when they "become ripe for filing." He added several insurance companies were pressuring Tristar to settle its liens "at significantly reduced amounts" due to his pending criminal charges.

Barri explained there was some confusion about whether Tristar's liens were stayed. Four days after the lien stay provision became effective Barri's "office" learned Tristar's liens had been flagged on the EAMS. The following day, the AFU removed the "'stay'" designation. The Government submitted evidence in June 2017 indicating Tristar's liens were not flagged on the website. Patterson declared she removed the flag for the Tristar liens because she was "told" it was included on the list by mistake. Our review of the most current version of the judicially noticed website shows Tristar is not on the list of flagged liens held by noncharged entities. However, Barri declared his representatives were unable to find WCJs willing to adjudicate his liens on the grounds they are stayed.

25

Barri also discussed the impact of the suspension provision. Barri stated that on April 3, 2017, he was suspended from participating in the workers' compensation system. He stated the special lien proceeding requires him to rebut the presumption the liens are tainted by his misconduct. He maintained, "I am unsure how to prove this negative: that Tristar's liens, many of which cover services that were provided years ago, and in some cases by providers other than me, were unconnected to criminal, fraudulent, or abusive conduct or activity. It is unclear to me whether Tristar's medical files will contain enough evidence to prove this negative."

II. *Right to Counsel*

Long ago, the United States Supreme Court concluded that pursuant to the Sixth Amendment, a defendant "should be afforded a fair opportunity to secure counsel of his own choice" when the defendant has the financial means. (*Powell v. Alabama* (1932) 287 U.S. 45, 53*;* see also *Wheat v. United States* (1988) 486 U.S. 153, 159.) Barri argues the lien stay provision violated his Sixth Amendment right to hire counsel of his choice, relying solely on *Luis v. United States* (2016) __ U.S. __ [136 S.Ct. 1083] (plur. opn. of Breyer, J.) (*Luis*). He argues his liens had no connection to his criminal activity and he needs payment from these liens to afford his criminal lawyer. The Government maintains the *Luis* case does not apply because liens at issue do not represent property "fully" belonging to an individual and there was inadequate evidence Barri actually needed additional funds to pay for his criminal lawyer. We agree with the Government.

The Supreme Court in *Luis* held the Government's pretrial restraint of legitimate, untainted assets needed to pay a reasonable fee for the assistance of counsel of choice violated the criminally charged defendant's Sixth Amendment rights. (*Luis, supra,* 136 S.Ct. at p. 1096 (plur. opn. of Breyer, J.).) In the *Luis* case, a federal grand jury indicted Sila Luis for conspiring to commit healthcare fraud by using the healthcare companies she operated to bill Medicare for services neither medically necessary nor

26

actually provided. The Government alleged the charged fraud resulted in $45 million improperly paid to Luis' companies. (*Id.* at p. 1103 (dis. opn. of Kennedy, J.).)

The court noted Luis had spent much of the fraudulently obtained money by the time she was indicted. "To establish its entitlement to a restraining order, the Government showed that Luis and her co-conspirators were dissipating the illegally obtained assets. In particular, they were transferring money involved in the scheme to various individuals and entities, including shell corporations owned by Luis' family members. As part of this process, Luis opened and closed well over 40 bank accounts and withdrew large amounts of cash to hide the conspiracy's proceeds. Luis personally received almost $4.5 million in funds and used at least some of that money to purchase luxury items, real estate, automobiles, and to travel. Based on this and other evidence, the district court entered an order prohibiting Luis from spending up to $45 million of her assets." (*Luis, supra,* 136 S.Ct. at p. 1104 (dis. opn. of Kennedy, J.).) Pursuant to 18 U.S.C. section 1345, the order stopped Luis from dissipating her remaining asset so that the Government could use the money to pay criminal penalties and restitution after conviction. (*Id.* at pp. 1087-1088 (plur. opn. of Breyer, J.).)

18 U.S.C. section 1345 permits a court to freeze certain assets when a criminal defendant has been charged with violating federal healthcare and banking laws, which includes three types of assets: "(1) property 'obtained as a result of' the crime, (2) property 'traceable' to the crime, and (3) other 'property of equivalent value.'" (*Luis, supra,* 136 S.Ct at p. 1087 (plur. opn. of Breyer, J.), quoting 18 U.S.C. § 1345(a)(2).) In *Luis,* the issue was whether the Government could freeze property falling into the third category, i.e., untainted assets belonging fully to Luis. (*Ibid.*) Thus, the case involved an "as applied" constitutional challenge to the court's order freezing Luis' assets.

There is not a majority opinion in *Luis*. Justice Breyer's four-justice plurality opinion framed the issue to be decided as follows: "The question presented is '[w]hether the pretrial restraint of a criminal defendant's legitimate, untainted assets

27

(those not traceable to a criminal offense) needed to retain counsel of choice violates the Fifth and Sixth Amendments.'" (*Luis, supra,* 136 S.Ct. at p. 1088 (plur. opn. of Breyer, J.).) The plurality opinion and Justice Thomas' concurrence answered the Sixth Amendment question in the affirmative. (*Id.* at p. 1096 (plur. opn. of Breyer, J.); *Id.* at p. 1097 (conc. opn. of Thomas, J.).) "[O]ur answer is that the pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment. The nature and importance of the constitutional right taken together with the nature of the assets lead us to this conclusion." (*Id.* at p. 1088 (plur. opn. of Breyer, J.).)

The plurality's analysis began with a general discussion of the Sixth Amendment, noting the right to assistance of counsel is "'fundamental,'" but it is also limited: "'[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire.' [Citation.]" (*Luis, supra,* 139 S.Ct. at p. 1089 (plur. opn. of Breyer, J.).) A defendant has no right "to an attorney who is not a member of the bar, or who has a conflict of interest due to a relationship with an opposing party[,]" nor does a defendant unable to afford counsel have a right "to have the [g]overnment pay for his preferred representational choice." (*Ibid*.)

The court rejected the Government's "wish[] to guarantee that . . . funds will be available later to help pay for statutory penalties (including forfeiture of untainted assets) and restitution, should it secure convictions." (*Luis, supra,* 139 S.Ct. at p. 1089 (plur. opn. of Breyer, J.).) It concluded the Government was relying on cases that were distinguishable because they involved tainted assets. (*Id.* at pp. 1089-1090.) It reasoned, "The relevant difference consists of the fact that the property here is untainted; *i.e.*, it belongs to the defendant, pure and simple. In this respect it differs from a robber's loot, a drug seller's cocaine, a burglar's tools, or other property associated with the planning, implementing, or concealing of a crime. The Government may well be able to freeze, perhaps to seize, assets of the latter, 'tainted' kind before trial. As a matter of property

28

law the defendant's ownership interest is imperfect.  The robber's loot belongs to the victim, not to the defendant. . . .  [¶]  The property at issue here, however, is not loot, contraband, or otherwise 'tainted.'  It belongs to the defendant." (*Id.* at p. 1090.)

The *Luis* court concluded the untainted character of the assets was a distinguishing factor.  (*Luis, supra,* 139 S.Ct. at pp. 1089-1090 (plur. opn. of Breyer, J.).)  It explained that in *Caplin & Drysdale, Charted v. U.S.* (1989) 491 U.S. 617, 624, the case involved tainted assets, where the title to the assets vested in the Government upon commission of the crime and, therefore, the defendant had no ownership interest and no right of title to those assets.  (*Luis, supra,* 139 S.Ct. at p. 1090 (plur. opn. of Breyer, J.).)  Similarly, it determined the *U.S. v. Monsanto* (1989) 491 U.S. 600, case "concerned only the pretrial restraint of assets *that were traceable to the crime* . . . thus, the statute passed title to those funds at the time the crime was committed (i.e., before the trial) . . . ." (*Luis, supra,* 139 S.Ct. at p. 1091 (plur. opn. of Breyer, J.).)  The court concluded these cases established "that whether property is 'forfeitable' or subject to pretrial restraint under Congress' scheme is a nuanced inquiry that very much depends on who has the superior interest in the property at issue." (*Ibid.*)

The court stated, "Here, by contrast, the Government seeks to impose restrictions upon Luis' *un*tainted property without any showing of any equivalent governmental interest in that property.  [I]f this were a bankruptcy case, the Government would be at most an unsecured creditor.  Although such creditors someday might collect from a debtor's general assets, they cannot be said to have any present claim to, or interest in, the debtor's property.  [Citations.]  The competing property interests in the tainted-and untainted-asset contexts therefore are not 'exactly the same.'  [Citation.]  At least regarding her untainted assets, Luis can at this point reasonably claim that the property is still 'mine,' free and clear." (*Id.* at p. 1092 (plur. opn. of Breyer, J.).)

The court held Luis' Sixth Amendment right to counsel of choice outweighed "the Government's contingent interest in securing its punishment of choice

(namely, criminal forfeiture) as well as the victims' interest in securing restitution (notably, from funds belonging to the defendant, not the victims)." (*Luis, supra,* 139 S.Ct. at p. 1093 (plur. opn. of Breyer, J.).) "While these interests are important, to deny the Government the order it requests will not inevitably undermine them, for, at least sometimes, the defendant may possess other assets—say, 'tainted' property—that might be used for forfeitures and restitution. [Citation.]" (*Ibid.*)

We take from the *Luis* decision that the following three requirements must be satisfied before holding a pretrial restraint of property violates the Sixth Amendment: (1) The property belongs fully to the defendant; (2) The property is entirely untainted by the criminal activity; and (3) The property is actually needed for the defendant to retain counsel. Applying these three elements here, Barri contends the proceeds from the liens fully belong to him, the assets are untainted by his criminal activity, and he will not be able to afford his attorney if the liens remain stayed. He concludes the lien stay provision on its face unconstitutionally restrains the same type of untainted assets at issue in the *Luis* case. Barri provided declarations to support the factual contention he will be unable to afford his criminal defense attorney.

We conclude Barri's workers' compensation liens are not at all like the assets described in the *Luis* case. The *Luis* defendant sought the return of assets held fully in *her possession* (real estate, luxury items, automobiles, and corporations). In this case, Barri's entitlement to payment on his liens can at best be described as uncertain. The liens are not assets belonging to Barri "pure and simple." (*Luis, supra,* 136 S.Ct. at p. 1090 (plur. opn. of Breyer, J.).) Rather, a workers' compensation lien represents an unreliable expectancy in a payment, contingent upon the satisfaction of several factors listed in the workers' compensation statutory scheme. Workers' compensation liens are heavily regulated statutory creations and the "rights are not vested until they are 'reduced to final judgment.' [Citation.]" (*Angelotti, supra,* 791 F.3d at p. 1081 [right to lien a statutory remedy not property interest protected by Fifth Amendment Taking Clause].)

30

As discussed, there is a lengthy list of "conditions of compensation" that must be satisfied before the lienholder can collect payment. (§ 3600.) The lien claimant's rights are always derivative of the injured worker's rights, and therefore, "to assert a lien against a compensation award, there must be a valid debt, and the debt must be in one of the classes enumerated in the statute for which a lien may be lawfully declared in that proceeding. [Citation.]" (Rassp et al., California Workers' Compensation Law (7th ed. 2017) § 17.01, p. 17-5.)

In light of the above, we conclude a workers' compensation lien is not personally owned "pure and simple" or "free and clear" by an accused/convicted medical provider such as Barri. Simply having a lien is meaningless unless the lien claimant can establish "the validity of the lien claim both as to entitlement and as to amount. [Citations.]" (Rassp et al., California Workers' Compensation Law (7th ed. 2017) § 17.01, p. 17-5; §§ 3202.5, 5705.) The workers' compensation lien represents a statutory remedy, rather than a typical asset. Because the right to receive payment is uncertain due to many statutory conditions and limitations to enforcement, we conclude it is not the type of personal asset protected by the Sixth Amendment.

While we believe the above ruling is dispositive, we note there is one other important distinction between the *Luis* decision and this case. In *Luis,* the Government violated a single defendant's right to counsel by taking property indisputably and entirely untainted by the defendant's criminal activity. (*Luis, supra,* 139 S.Ct. at p. 1085 (plur. opn. of Breyer, J.).) There was no factual dispute about the untainted nature of the assets at issue. In contrast, here, there has been no determination or stipulation Barri/Tristar's liens are untainted by Barri's criminal activity.

Barri's and his criminal defense attorney's (Jessica C. Munk) declarations on this point are insufficient. Without a criminal disposition, we can only speculate as to the true nature and scope of Barri's "complex medical billing fraud" and kickback scheme. As noted by Kim in her declaration, typically workers' compensation fraud

31

involves "far-reaching kickback and/or cross-referral schemes involving multiple parties and entities, and huge sums of fraudulent billings." For many charged providers "the criminal operations involved were highly sophisticated, involving complex financial relationships among multiple co-conspirators or co-defendants, and also potentially involving a number of business entities either owned, controlled, or used in some manner in the facilitation of the crimes, by the charged/convicted providers." Without a conviction, it cannot be unequivocally said which liens are free from the taint of the criminal conduct.

We recognize the parties presented a factual dispute regarding the third element of *Luis,* i.e., Barri's actual need for the assets at issue. In the *Luis* case, the Government *conceded* freezing the funds would have the consequence of interfering with defendant's "ability to use the funds she needs to pay for her chosen attorney." (*Luis, supra,* 136 S.Ct. at p. 1089 (plur. opn. of Breyer, J.).) In that case, there was no factual issue regarding whether defendant actually needed the assets to retain counsel. Such is not the case here. Barri presented evidence he is financially destitute. The Government presented evidence Barri and his wife received income from employment, possessed cars, and rented an expensive home. We need not resolve this factual dispute. Our prior determination *Luis'* reasoning does not apply to the Government's temporary stay of pending workers' compensation liens is dispositive. We find no merit to Barri's Sixth Amendment facial and as applied challenges to the lien stay provision.

III. *Right to Petition the Courts*

"The right to petition the government for redress of grievances is protected by both the federal and state Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 3.) . . . As pertinent here, the right has also been construed as encompassing the right to petition the judicial branch for resolution of legal disputes. [Citations.] [¶] While the right of petition 'is accorded "a paramount and preferred place in our democratic system"' . . . [r]easonable, narrowly drawn restrictions designed to prevent abuse of the

32

right can be valid. [Citation.]" (*Vargas v. City of Salinas* (2011) 200 Cal.App.4th 1331, 1342.)

Barri maintains the lien stay provision is not reasonable or narrowly drawn. He explains, "[I]t unreasonably results in lengthy, unwarranted delays before lien claimants can finally litigate their lien claims on the merits, including untainted lien claims." Barri maintains the statute should be more narrowly drawn to stay only tainted liens and exclude liens related to uncharged providers.

Noticeably missing from the briefing on this argument is any legal authority supporting the notion a statutorily imposed *delay* in the resolution of a legal dispute is the same thing as *barring* one from exercising their right to petition. Moreover, the argument has been rendered moot in part by evidence in our record showing WCJs have scheduled hearings to address grievances from both charged providers and noncharged entities. And after Barri's criminal proceedings conclude he will be afforded a forum to address his grievances about the liens. (§ 139.21, subds. (e) & (f) [consolidated special lien proceedings].) There is no evidence suggesting this forum will be diminished or inadequate. Finally, Barri's complaints about the lien stay provision are currently being heard by this court. In light of all the above, we conclude this constitutional challenge lacks merit.

IV. *Due Process Claims*

As the Supreme Court has explained: "This Court has held that the Due Process Clause protects individuals against *two types* of government action. So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty,' . . . . When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner . . . . This requirement has traditionally been referred to as 'procedural' due process." (*United States v. Salerno* (1987) 481 U.S. 739, 746, italics added.)

33

Barri's briefing does not distinguish between the two types of government action. We conclude his due process challenges fall into the following categories: (1) those relating to the benefit *of receiving* payment; and (2) those resting on a lien claimant's interest *in litigating* his grievances. The first category includes Barri's argument the new anti-fraud legislation impermissibly and unfairly stays liens untainted by criminal misconduct. This is a substantive due process claim. The second category relates to allegations the statute is not implemented in a fair manner because of notice deficiencies and the absence of any timely procedure to be heard on the decision to stay untainted liens or those related to uncharged providers. These are procedural due process claims.

We note the Government's response to these due process challenges is to lump them together and boldly argue there can *never* be a cognizable due process claim concerning worker's compensation legislation. (Citing Cal. Const., art. XIV, § 4 [plenary power over worker's compensation system]; *Stevens v. Workers' Comp. Appeals Bd.* (2015) 241 Cal.App.4th 1074, 1093 (*Stevens*).) Although its analysis of the issues was incorrect, we conclude there are other reasons why the anti-fraud legislation does not violate substantive due process, Federal procedural due process, or State procedural due process.

A. *Substantive Due Process*

Barri's substantive due process argument attacks the statute's overinclusive application to untainted liens. "The term 'substantive due process' refers to a line of disparate cases which generally concludes that the guaranty of due process in the Fifth and Fourteenth Amendments includes a 'substantive' component that restricts infringement upon certain fundamental 'liberty interests.' [Citation.]" (*People v. Rodriguez* (1998) 66 Cal.App.4th 157, 175.) "'Generally, the constitutional guaranty of substantive due process protects against arbitrary legislative action; it requires legislation not to be "unreasonable, arbitrary or capricious" but to have "a real and substantial

34

relation to the object sought to be attained." . . .' [Citation.]" (*Longval v. Workers' Comp. Appeals Bd.* (1996) 51 Cal.App.4th 792, 800.) Consequently, legislation does not violate substantive due process so long as it reasonably relates "'to a proper legislative goal.' [Citations.]" (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125 (*Coleman*).)

"The analysis under substantive due process begins with a careful description of the right asserted. [Citations.] Because of the inherently subjective nature of substantive due process, courts proceed cautiously when asked to break new ground under this guise. [Citations.]" (*People v. Santos* (2007) 147 Cal.App.4th 965, 978 (*Santos*).)

The lien stay provision calls for the automatic stay of any liens held by criminally charged providers and the noncharged entities they control. The legislation potentially sweeps up untainted liens, resulting in a substantial economic loss to an innocent party for a lengthy period of time. Thus, it appears the right being asserted is solely economic. With this conclusion in mind, we turn to the second step in the analysis.

"'The second step in a substantive due process analysis requires the court to determine whether the right or liberty interest sought to be protected is a "fundamental" one. [Citation.]' [Citation.]" "'If the asserted right is not such a fundamental interest, it is not entitled to protection under the Due Process Clause of the Fourteenth Amendment.' [Citation.]" (*Santos, supra,* 147 Cal.App.4th at p. 979.)

"The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.' [Citation.] [¶] . . . 'In an effort to scale back what had become an apparently unbounded source of judicial authority, the Supreme Court in recent decades has restricted the scope of substantive due process. [¶] There can be no doubt that the Due Process Clause of the Fourteenth Amendment confers both procedural and substantive

35

rights. . . . *However, the use of substantive due process to extend constitutional protection to economic and property rights has been largely discredited. . . .* Rather, recent jurisprudence restricts the reach of the protections of substantive due process primarily to liberties "deeply rooted in this Nation's history and tradition." . . . Thus, the Fourteenth Amendment protects against a State's interferences with "personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education," as well as with an individual's bodily integrity.' [Citation.]" (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1183-1184 (*Clark*).)

Barri's argument fails at this second step of the analysis. Barri does not suggest why his right to timely process untainted liens qualifies as a *fundamental* interest entitled to substantive due process protection. It is an economic right, created by statute, heavily regulated by the government, and derivative to an injured worker's ability to satisfy numerous requirements. (See *Angelotti, supra,* 791 F.3d at p. 1081 [right to benefits statutory and not vested until reduced to final judgment].)

Finally, we conclude the legislative action in this case was not arbitrary or irrational, and does not "'shock the conscience.'" (*Uhlrig v. Harder* (10th Cir. 1995) 64 F.3d 567, 574.) As plainly stated in the uncodified statement of legislative declarations, the workers' compensation system was facing an administrative crisis due to the "continued funding of fraudulent practices through ongoing lien collections during the pendency of criminal proceedings[,]" which not only threatened the health and safety of injured workers but also undermined public confidence in the system. (Stats. 2016, ch. 868, § 16.) It was not irrational for the Legislature to take action to stop payments for fraudulent schemes. It created a legislative scheme to simply maintain the status quo until after the criminal case has concluded, when it can be conclusively decided if the liens were untainted or tainted (payable or dismissed). We conclude legislation that temporarily halts payment, but does not eliminate the right to collect on untainted liens, reasonably relates to a "proper legislative goal." (*Coleman, supra,* 52 Cal.3d at p. 1125.)

36

Although application of the lien stay provision may result in a delayed payment of some valid untainted liens, it cannot be said the governments' action "demonstrate[s] a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." (*Ibid;* see *Clark, supra*, 48 Cal.App.4th at p. 1185 [substantive due process violation requires level of outrageousness greater than ordinary tort].) We conclude Barri has not proven a violation of substantive due process.

B. *Procedural Due Process*

Barri relies on both the federal and state due process clause. Each has different requirements, and therefore we will address them separately.

*i. Federal Due Process Clause*

Turning first to the federal constitution, the due process clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." (U.S. Const. amend. XIV, § 1.) Accordingly, "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" (*American Mfrs. Mut. Ins. v. Sullivan* (1999) 526 U.S. 40, 59.)

The Government argues Barri (or any lien claimant) cannot assert a federal due process claim because there is no property interest in lien claims. We disagree. Earlier in this opinion we reached the conclusion Barri does not necessarily have a statutorily conferred benefit *in receiving payment* on a workers' compensation lien. It is not a fully owned asset. The right to payment is conditional and uncertain until there is a final judgment in the injured worker's claim. However, the basis for Barri's federal procedural due process challenge is not based on the benefit *of receiving* payment but rests with his interest *in litigating* grievances.

In *Logan v. Zimmerman Brush Co.* (1982) 455 U.S. 422, 428-431 (*Logan*), the United States Supreme Court held the right to use statutory adjudicatory procedures provided by state law *constitutes a type of property protected by the due process clause*.

37

In that case, the court determined an employee was deprived of a protected property interest when his claim under the Illinois Fair Employment Practices Act (FEPA) was terminated due to a state official's failure to follow certain procedures. (*Id.* at p. 424.) The court held the employee's statutory right to use FEPA's adjudicatory procedures in challenging his or her termination was protected by the due process clause. (*Id.* at pp. 430-431.) In reaching this conclusion, the *Logan* court noted, "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." (*Id.* at p. 428.)

We see no meaningful distinction between the "right of access to the court" to pursue a cause of action, from the right of access to an appropriate administrative hearing to pursue a workers' compensation claim. Both types of litigants wish to use established adjudicatory procedures for their grievances to be heard. As noted by Barri, long ago an appellate court in *Kaiser Co. v. Industrial Acc. Com.* (1952) 109 Cal.App. 2d 54, 57-58, held workers' compensation administrative proceedings are protected property interests under the federal due process clause. It determined the constitutional provision authorizing the creation of WCAB (then called the Industrial Accident Commission) allowed it to function as a court. (*Id.* at p. 57.) "'Even if regarded as a purely administrative agency, however, in exercising adjudicatory functions the commission is bound by the due process clause of the Fourteenth Amendment to the United States Constitution to give the parties before it a fair and open hearing. "The right to such a hearing is one of 'the rudiments of fair play' [citation] assured to every litigant by the Fourteenth Amendment as a minimal requirement." [Citations.]'" (*Id.* at p. 58.)

Additionally, there are many decisions, including a California Supreme Court case, holding the right to adjudicate lien claims is protected by our state due process clause, and we find their reasoning applicable to federal due process. (See e.g., *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811 (*Vacanti*) [lien claimants become parties in interest to WCAB proceedings and "receive[]

38

full due process rights, including an opportunity to be heard"]; *Chorn v. Workers' Comp. Appeals Bd.* (2016) 245 Cal.App.4th 1370, 1387-1388 (*Chorn*) [plaintiff can challenge procedural due process relating to newly enacted statute imposing workers' compensation lien filing fee]; *Boehm & Associates v. Workers' Comp. Appeals Bd.* (2003) 108 Cal.App.4th 137, 150 ["'A lien claimant is entitled to a hearing on the merits of his or her lien claim as a matter of procedural due process'"]; *Hand Rehabilitation Center v. Workers' Comp. Appeals Bd.* (1995) 34 Cal.App.4th 1204, 1210; *Beverly Hills Multispecialty Group, Inc. v. Workers' Comp. Appeals Bd.* (1994) 26 Cal.App.4th 789, 803; *Fox v. Workers' Comp. Appeals Bd.* (1992) 4 Cal.App.4th 1196, 1204-1205.)  There are also treatises that agree on this point.  (Rassp et al., California Workers' Compensation Law (7th ed. 2017) § 17.111[5], p. 17-63 [the lien claimant must be accorded due process].)

To summarize, because the workers' compensation statutory scheme gives the WCAB exclusive jurisdiction over the creation, adjudication, and payment of liens, a claimant has no other remedies available to recover payment for his or her services.  The statutory scheme currently gives lien claimants due process rights regarding efforts to recover payments as a party to the adjudication of the injured worker's claim.  (See Cal. Code Regs., tit. 8, § 10301, subd. (dd)(6) [lien claimant is a party]; § 10770.1 [lien conference and trials].)  The Government offers no reason why due process should not also be timely afforded to a claimant challenging the AFU's application of section 4615.  We conclude lien claimants have a protectable property interest in meaningful participation in the workers' compensation system.

ii. *State Due Process Clause*

"The due process clause of the California Constitution provides that '[a] person may not be deprived of life, liberty, or property without due process of law . . . .' (Cal. Const., art. I, § 7, subd. (a).)  Analysis under this clause 'differs from that conducted pursuant to the federal due process clause in that the claimant need not establish a

39

property or liberty interest as a prerequisite to invoking due process protection.' [Citation.] Although the aggrieved party need not establish a protected property interest, he or she 'must nevertheless identify a statutorily conferred benefit or interest of which he or she has been deprived to trigger procedural due process under the California Constitution . . . .' [Citation.] 'The "requirement of a statutorily conferred benefit limits the universe of potential due process claims: presumably not every citizen adversely affected by governmental action can assert due process rights; identification of a statutory benefit subject to deprivation is a prerequisite." [Citation.]' [Citation.] *The right to workers' compensation benefits is wholly statutory* [citation], and, because lien claimants' rights to payment arise from the employee's right to compensation [citation], those rights too are statutory. Though such rights do not fully vest until they are reduced to final judgment [citations], they nonetheless are conferred by statute and as such trigger *a right to procedural due process under the state Constitution* [citation]." (*Chorn, supra,* 245 Cal.App.4th at pp. 1387-1388, italics added; citing *Vacanti, supra,* 24 Cal.4th at p. 811.)

As mentioned in the previous section, several other appellate courts have considered state procedural due process challenges. (See e.g. *Boehm & Associates v. Workers' Comp. Appeals Bd.* (2003) 108 Cal.App.4th 137, 150 [right to due process "guarantees lien claimants a right to notice and to participate at trial"].) Despite the above authority, the Government argues there can *never* be a state due process violation related to worker's compensation legislation. To support this theory, the Government relies entirely on a single appellate decision from the First District, Division One, *Stevens, supra,* 241 Cal.App.4th 1074. We agree with Barri that the Government reads *Stevens* too broadly.

The *Stevens* case considered workers' compensation reform legislation that went into effect in 2004 and was modified in 2013 to make "the system more efficient and less costly by having injured workers' requests for medical treatment evaluated

40

through a process called utilization review (UR)." (*Stevens, supra,* 241 Cal.App.4th at p. 1081, fn. omitted.) "[U]nder the UR process, workers can challenge decisions denying requested treatment, but employers cannot challenge decisions approving it. . . . In 2013, additional reforms went into effect that built off the 2004 legislation and established a new procedure, independent medical review (IMR), to resolve workers' challenges to UR decisions." (*Id.* at p. 1081, fns. omitted.) "A worker who disputes the IMR determination may appeal it to the Board. (§ 4610.6, subd. (h).)" (*Id.* at p. 1091.) The Board's decision is subject to review in the appellate court. (*Ibid.*) An injured worker challenged the constitutionality of the IMR process on state and federal due process grounds.

The *Stevens* court rejected the worker's claims for the following reasons. It explained, "Under Section 4, the Legislature 'is . . . expressly vested with plenary power, *unlimited by any provision of this Constitution*, to create, and enforce a complete system of workers' compensation, by appropriate legislation.' (Cal. Const., art. XIV, § 4, italics added.) . . . [¶] . . . Our state Supreme Court has made clear that constitutional amendments can be 'understood as carving out an exception to the preexisting scope of the . . . due process clause[] with respect to the particular subject matter encompassed by the new provision.' [Citation.] By giving the Legislature plenary powers over the workers' compensation system, [s]ection 4 modified the reach of the state Constitution's due process clause." (*Stevens, supra,* 241 Cal.App.4th at pp. 1092-1093.)

It reasoned, "Section 4 'affirms the legislative prerogative in the workers' compensation realm in broad and sweeping language' and confers on the Legislature 'the power to "fix and control the method and manner of trial of any . . . dispute[s over compensation for injury] [and] the rules of evidence [applicable to] the tribunal or tribunals designated by it."' [Citation.] [¶] The Legislature's broad power over workers' compensation matters has been repeatedly affirmed. [Citations.] These cases confirm that *nearly any exercise* of the Legislature's plenary powers over workers' compensation

41

is permissible so long as the Legislature finds its action to be 'necessary to the effectiveness of the system of workers' compensation.' [Citation.] Indeed, the only limitations on the Legislature's plenary powers, neither of which applies here, are that the Legislature cannot act outside of its authority to create and to enforce a complete system of workers' compensation [citation], or, as we discuss below (in our analysis of the workers' federal due process claim) enact a provision that conflicts with federal law." (*Stevens, supra,* 241 Cal.App.4th at pp. 1094-1095, italics added.)

Thus, the court in *Stevens* recognized there were some limitations to the power to legislate under section 4. The Legislature cannot carte blanche exercise its plenary powers and create legislation (1) unnecessary to the workers' compensation system or that (2) conflicts with the federal due process clause. (See *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 343 [section 4 "obviously does not envision legislation" authorizing WCAB to discipline attorneys].)

On the first point, the *Stevens* court concluded the IMR legislation did not conflict with "Section 4's mandate that the workers' compensation system provide 'substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character.'" (*Stevens, supra,* 241 Cal.App.4th at p. 1096.) The court noted the Legislature determined the new system was necessary, furthered the State's social policy of providing quality medical care to injured workers care, and promoted substantial justice. (*Id.* at p. 1096.)

On the second point, the *Stevens* court concluded the IMR process did not violate federal principles of due process. (*Stevens, supra,* 241 Cal.App.4th at pp. 1096-1097.) Assuming, but not deciding, IMR determination was a constitutionally protected property interest, the court concluded the injured worker was "afforded ample process." (*Id.* at p. 1098.) "'The core of due process is the right to notice and a meaningful opportunity to be heard.' [Citations.] . . . [W]orkers seeking treatment under California's

42

scheme receive far more process, including through UR, than just that which is provided in the IMR procedure." (*Ibid.*)

It is interesting to note the *Stevens* opinion did not discuss Supreme Court authority or any of the other cases that have evaluated the merits of state constitutional challenges to various workers' compensation statutes. (See *Vacanti, supra,* 24 Cal.4th at p. 811; *Chorn, supra,* 245 Cal.App.4th at pp. 1387-1388.) Noticeably absent from the Government's briefing is any acknowledgement of the *Vanguard* case's preliminary injunction based on the legal conclusion the lien stay provision suffers from federal procedural due process defects. As acknowledged in *Stevens,* "[T]he Legislature cannot act *outside* of its authority to create . . . a provision that conflicts with federal law." (*Stevens, supra,* 241 Cal.App.4th at pp. 1094-1095.)

For all of the above reasons, we reject the Government's theory the Legislature's plenary power (described in section 4) automatically eliminated all state due process challenges. Because we have concluded lien claimants can allege a deprivation of a protected interest as required by the federal constitution, and because the purported violations are not automatically "trumped" by section 4, we next "look to see if the State's procedures comport with due process." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 214 (*Fresh Start*).)

"'[O]nce it is determined that the Due Process Clause applies, "the question remains what process is due.'" [Citations.]" (*Fresh Start, supra,* 57 Cal.4th at p. 214.) Barri challenges the stay procedures in three respects: (1) inadequate notice to noncharged entities; (2) no right to a hearing regarding AFU's flagging decision to correct mistakes in application of section 4615; and (3) no right to a hearing to adjudicate whether a particular lien is tainted or untainted.

C. *Notice*

"What safeguards comport with due process or what due process requires under specific circumstances varies, as not every context to which the right to procedural

43

due process applies requires the same procedure. The primary purpose of procedural due process is to *provide affected parties with the right to be heard at a meaningful time and in a meaningful manner*. Consequently, due process is a flexible concept, as the characteristic of elasticity is required in order to tailor the process to the particular need. [Citations.] Thus, not every situation requires a formal hearing accompanied by the full rights of confrontation and cross-examination. [Citation.] 'What *due process does require is notice reasonably calculated to apprise interested parties of the pendency of the action affecting their property interest and an opportunity to present their objections*. [Citation.]'" (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1072, italics added.)

Barri's first procedural due process argument concerning the lien stay provision relates to notice. In the petition, he asserted the Government had no procedures or mechanism in place for noncharged entities to receive notice their liens have been stayed. Moreover, it was unclear what criteria AFU was using to "flag" the liens of noncharged entities. We conclude the lack of notice claim has been rendered moot.

Six months after Barri filed his petition, and not long after the *Vanguard* preliminary injunction order, the Government updated its website to include a list of "flagged" noncharged entities. In addition, Barri's petition predated the Governor's clean-up legislation (AB 1422), which clarified noncharged providers' liens will be stayed if "controlled" by the criminally charged provider. (§ 4615 [lien stay provision].) The new legislation stated, "For purposes of [section 139.21] and [the lien stay provision], an entity is controlled by an individual if the individual is an officer or a director of the entity, or a shareholder with a 10 percent or greater interest in the entity." (§ 139.21, subd. (a)(3).) By defining the term "controlled," there is no longer speculation

about the criteria used before the Government adds a noncharged entity to the list posted on its website. Barri's complaints regarding *notice deficiencies* have been remedied.[6]

Before moving on, we wish to address an issue Barri raised in supplemental briefing regarding the clean-up legislation. He asserted the new definition describing when an entity is controlled created new constitutional problems. He argued the definition was broadly written and, therefore, could potentially include innocent providers. The Government responded by stating the definition was modeled on Welfare and Institutions Code section 14123, governing provider suspensions for Medi-Cal, and appropriately clarified the criteria that should be used to stay noncharged entities' liens. It failed to cite any case authority holding the definition, in either statute, was constitutionally sound.

In later briefing, Barri repeated his argument but did not ask this court to take judicial notice of any evidence relating to this new issue. The Government submitted Kim's declaration, in which she explained past workers' compensation fraud cases have revealed that "most often" the individual medical provider is convicted, "not the medical entity through which the [convicted provider] operated and through which, often, liens were filed in the workers' compensation system." She maintained there was little risk the stay would be applied to entities in which the convicted provider has not actively managed or controlled. The Government argued there was sound public policy for the Legislature's definition of "controlled entit[ies]."

---

[6]      In supplemental briefing, Barri complains the updated website does not tell noncharged entities the name of the criminally charged provider controlling the entity. This is true. It is conceivable some noncharged entities may be unclear as to why its liens were flagged. We hope the Government will soon remedy this obvious deficiency, but it cannot be said this defect means the noncharged entity was deprived notice as required by the due process clause. The website adequately apprises noncharged entities of the action affecting their property interest.

45

We agree with the Government's second argument that even if the definition might be overbroad as applied in some circumstances, this conclusion would not be grounds to find the antifraud legislation unconstitutional. "'"'To support a determination of facial unconstitutionality, voiding the statute as a whole, petitioners cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute . . . . Rather, petitioners must demonstrate that the act's provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions."' [Citations.]" (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) Barri has not shown the law is unconstitutional in all circumstances (facial challenge) or has been actually applied in an unconstitutionally impermissible manner (as applied challenge).

D. *The Right to be Heard*

Barri's second procedural due process argument concerns the opportunity to be heard. Specifically, he maintains there is no mechanism to complain a lien was improperly flagged or dispute whether the proper criteria was met for the stay. Barri also contends claimants should be able to adjudicate whether the lien is tainted before the criminal case has concluded. Because there are procedures in place to litigate flagging mistakes, but no hearing available for the latter type dispute, we will address these procedural due process arguments separately.

*Mathews v. Eldridge* (1976) 424 U.S. 319, 335 (*Mathews*), provides a court should consider three factors when determining whether a given administrative procedure meets "the specific dictates of due process" for depriving an individual of an interest: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [Citation.]"

46

Unlike the suspension provision, the lien stay provision does not contain any specific information regarding what procedural due process should be afforded lien claimants until after the criminal case ends. There is no hearing associated with imposition of the lien. The stay is automatic. There are no procedures calling for a hearing or WCJ order imposing the stay. There is no dispute that once "flagged" on the Government's website, the lien claimant is precluded from moving forward as a party wishing to adjudicate the lien. The statute does not give WCJs any authority or discretion to grant exceptions.

The only right to a hearing mentioned in the statute takes place after the criminal case concludes. At that time, the criminally convicted provider and noncharged entity are entitled to a special procedure for adjudicating the validity of the entire collection of stayed liens, i.e., a determination if the liens are tainted or untainted.

Barri contends claimants must be afforded a timely opportunity to be heard about mistakes relating to an automatically stayed lien. Judge Wu issued the preliminary injunction based on the conclusion a medical provider and noncharged entity could *both* have legitimate challenges regarding an erroneous application of the lien stay provision. We agree lien claimants have a protectable private interest in a timely review of cases involving misidentification or misapplication of section 4615 criteria. The first *Mathews* factor is satisfied.

As for the second *Mathews* factor, it should not be overlooked the statute itself recognized procedures should be developed to avoid the risk of an erroneous deprivation. The original version of the lien stay provision provided "[t]he administrative director *may* adopt rules for the implementation of this section." (§ 4615, subd. (f), italics added.) The amended version clarified the WCAB "is not precluded" from considering "whether a lien is stayed" properly or whether a noncharged provider is "controlled by" a charged provider. Although the clean-up legislation clarified that the WCAB should develop procedures to address whether a lien was properly stayed, the

47

Government was slow to respond. To date the administrative director has not publically announced new rules for implementation of the lien stay provision. However, more recently WCJ's have reconfigured existing procedures to allowed claimants with stayed (but unripe) liens to be heard on a few limited procedural issues.[7] It is undisputed there are currently over one hundred lien conferences/trials scheduled to address complaints regarding the AFU's application of section 4615.

The second *Mathews* factor also involves consideration of "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." (*Mathews, supra,* 424 U.S. at p. 335.) This factor was more relevant when Barri filed his petition. However, in light of the Government's decision to afford claimants a hearing, the risk of erroneous deprivation has been somewhat curtailed. The Government concedes its "flagging" system is not infallible, but AFU has developed a method of review to minimize the risk of mistakes or misidentifications. Kim declared any mistakes may be informally brought to the attention of the AFU's staff for reevaluation, or formally considered by a WCJ in an evidentiary hearing. Barri does not suggest what additional or substitute procedural safeguards should be put in place.

Instead, Barri's argument focuses on the evidence showing claimants have been experiencing unnecessary delays when seeking to correct AFU's mistakes before a WCJ. He provided evidence the process of bringing the matter before a WCJ is overly expensive and hearings are often delayed for the improper purpose of notifying a nonparty (AFU), or to allow the WCJ to collect evidence from the AFU that supports its flagging decision.

---

[7] We appreciate the WCJs who have taken steps towards the important goal of applying the new anti-fraud legislation in a way that will be consistent with the state and federal constitutional right to be heard in a meaningful time and manner.

48

While there may be more efficient ways to notify the AFU of hearings, and a more timely method to transmit supporting documentation to the WCJs, it cannot be said a claimant's due process rights are violated by these actions. To the contrary, "Based on the constitutional mandate to accomplish substantial justice, the WCJ has a duty to develop an adequate record. [Citations.]" (*Kuykendall v. Workers' Comp. Appeals Bd.* (2000) 79 Cal.App.4th 396, 403.) "[I]t is well established that the WCJ or the Board may not leave undeveloped matters which it acquired specialized knowledge should identify as requiring further evidence. [Citations.]" (*Id.* at p. 404.) WCJs are not bound by "the common law or statutory rules of evidence and procedure" and may consider oral testimony and records "best calculated to ascertain the substantial rights of the parties and carry out justly the spirit and provisions of this division." (§ 5708.) Weighing the second factor in the due process analysis, we conclude lien claimants are being given a meaningful opportunity to present their case. An evidentiary hearing is certainly an adequate forum to correct any erroneous application of section 4615.

The third factor is the public interest in section 4615. The Legislature explained it enacted the anti-fraud legislation to address several important public concerns. (See Stats. 2016, ch. 868, § 16.) Specifically, the legislation promotes the Government's interest in protecting the public against medical providers who engage in misconduct. In addition, it helps the Government regain public confidence in the workers' compensation system by halting the appalling funding of fraudulent practices while there are pending criminal proceedings. The legislature believed that by maintaining the status quo during a criminal proceeding, they could alleviate the excessive and unnecessary burdens created by fraudulent liens processed in the workers' compensation system.

Weighing the above three factors, we conclude the Government adequately provides claimants a meaningful opportunity to present their cases before a WCJ to

address proper application of section 4615. Due process requires no more. Accordingly, we conclude there is no due process violation.

Turning to Barri's final procedural due process claim, we reach the same conclusion but for a different reason. Barri maintains claimants have the right to be heard on the propriety of the medical provider's criminal case and/or whether the lien is tainted by criminal misconduct. As stated, the statute specifically provides for a hearing on these issues when the criminal case has been completed. Barri is suggesting due process requires an earlier evidentiary hearing, duplicating the one concurrently being held in the criminal courts. We disagree.

"'[T]he extent to which due process [protections] will be available depends on a careful and clearly articulated balancing of the interests at stake in each context." (*Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 286.) Typically, crimes involving workers' compensation fraud involve multiple parties and entities, having numerous liens, creating the potential for thousands of individual lien trials/hearings each on the issue of whether one particular lien is tainted or untainted. To determine whether the lien is tainted before completion on the criminal trial would create a very high fiscal and administrative burden on the Government, with nothing to gain but the confusion created by the possibility of conflicting judgments in two forums. The mountain of evidence typically gathered by the district attorney in prosecuting complex fraud criminal cases would have to be introduced in each lien trial, overloading already burdened WCJs. The statute's provision for a special consolidated lien hearing, following the criminal trial, avoids conflicting orders and promotes judicial economy.

Contrary to Barri's contention, it is not feasible to determine which liens are tainted or untainted until after a criminal conviction, where there is a *final factual determination* on the scope of the provider's misconduct and fraudulent practices. To allow a WCJ to lift the stay before the benefit of having a criminal disposition would be contrary to the legislative intent to stop payment on ill-gotten liens and lessen the fiscal

and administrative burdens created by these liens. Due process does not require an abridged criminal trial heard by a WCJ or WCAB before completion of the actual criminal trial. The statute provides claimants adequate due process to litigate their untainted liens following the criminal conviction.

IV. *Ex Post Facto Clause*

Barri complains the suspension and special lien preceding provisions contained in section 139.21 represent a significant change to the worker's compensation laws that cannot be applied retroactively. Barri explains he entered a guilty plea six months before the Legislature enacted the anti-fraud legislation. He asserts the new laws should not concern him or any other lien claimants sustaining criminal convictions before the statute's enactment because application violates the ex post facto clauses of the Federal Constitution (U.S. Const., art. I, § 10, cl. 1) and of the California Constitution (Cal. Const., art. I, § 9).

The ex post facto clause of the California Constitution is to be analyzed identically to that of the United States Constitution. (*People v. McVickers* (1992) 4 Cal.4th 81, 84 (*McVickers*).) "The United States Supreme Court has recently restructured its analysis of the ex post facto clause. As now interpreted, the clause prohibits three legislative categories: legislation '"[1] which punishes as a crime an act previously committed, which was innocent when done; [2] which makes more burdensome the punishment for a crime, after its commission, or [3] which deprives one charged with crime of any defense available according to law at the time when the act was committed . . . ."' [Citations.] The court, returning the clause to its historical roots, overruled a line of prior cases holding that a law violates the ex post facto clause if it eliminates a 'substantial protection' in place when the offense was committed. (*Ibid.*)

We agree with the parties that the plain language of section 139.21 indicates the legislative intent was to include providers who had previously been convicted of crimes before passage of the statute. The Legislature selected a past verb

51

tense when defining the scope of medical providers covered by the statute. Their decision to include any provider who "has been" convicted refers to criminals in the same situation as Barri. This interpretation supports the Legislative intent of this anti-fraud legislation to stop criminals from misusing the workers compensation system, not just those medical providers who have been recently caught and are awaiting trial.

Although section 139.21 applies retroactively, we conclude it does not violate Barri's ex post facto rights. "In an unbroken chain of cases, our Supreme Court and the United States Supreme Court have held that the ex post facto prohibition applies only to criminal statutes. (See, e.g., *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 180 ["The ex post facto clauses (U.S. Const., art. I, § 9, cl. 3; Cal. Const., art. I, § 9) apply only to penal statutes"] . . . .)" (*People v. 25651 Minoa Dr.* (1992) 2 Cal.App.4th 787, 795 (*25651 Minoa*).)

Section 139.21 is not a criminal statute. Its primary purpose is to stop and protect against further abuses of an overburdened workers' compensation system, and protect injured workers and the public. (Stats. 2016, ch. 868, § 16.) The suspension provision is not located in the Penal Code, but is listed as part of one of the Labor Code's workers' compensation proceedings. Unlike all other types of punishment, a suspension *is not automatic* or immediately imposed following a conviction. (§ 139.21, subd. (a) ["promptly suspend" following notice and hearing].) A convicted medical provider may ask "the administrative director" for a hearing, and after those proceedings, the "hearing officer" may ultimately decide against suspension. (§ 139.21, subd. (b).)

We reject Barri's assertion the suspension and special lien hearing are really criminal proceedings hidden under a "civil label." We find instructive *Smith v. Doe* (2003) 538 U.S. 84, 92. The Supreme Court in *Smith* considered for the first time whether the sex offender registration and notification law constituted retroactive

52

punishment forbidden by the ex post facto clause. (*Id.* at p. 92.) "The framework for our inquiry . . . is well established. We must 'ascertain whether the legislature meant the statute to establish "civil" proceedings.' [Citation.] If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is '"so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil."' [Citations.] Because we 'ordinarily defer to the legislature's stated intent," [citation], '"only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty,' [citations]." (*Ibid.*) Thus, whether the workers' compensation statutory provisions regarding stays and suspensions are civil or criminal is a matter of statutory construction. "We consider the statute's text and its structure to determine the legislative objective. [Citation.]" (*Ibid.*)

In this case, the Legislature clearly stated its intention was to enact a civil regulatory scheme and remedy. The uncodified section of SB 1160 plainly expressed the Legislature was exercising its plenary power (section 4 of Article XIV), to enact two related statutes designed to protect an overburdened workers' compensation system from the administrative strain of continuing to process liens eventually dismissed due to criminal convictions and from making payments on unlawful liens for fraudulent medical services. In short, they exerted their plenary power to create a civil regulatory scheme designed to prevent the unnecessary processing and payment on liens tainted by fraud and other misconduct.

The legislators stated, "The ability of providers . . . to continue to file and to collect on liens, while criminal charges are pending against the provider, including through the use of lien for collection assignments, has created excessive and unnecessary administrative burdens for the workers' compensation system, has resulted in pressure on employers and insurers to settle liens that may in fact have arisen from prior or ongoing

53

criminal conduct, has threatened the health and safety of workers who may be referred for or receive medical treatment or other medical-legal services that are not reasonable and necessary, has allowed continued funding of fraudulent practices through ongoing lien collections during the pendency of criminal proceedings, and has undermined public confidence in the workers' compensation system." (Stats. 2016, ch. 868, § 16.) This plainly articulated legislative objective is the "clearest proof" section 139.21 represents a civil remedy. It was not intended to serve as additional punishment to a lien claimant.

The legislation at issue is similar to the statutes discussing the administrative proceedings to revoke, suspend, or impose discipline on professional license following wrongful conduct. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 785-786 [architect disciplinary proceedings not punishment but designed to protect public].) Those statutes have been repeatedly deemed "noncriminal and nonpenal" because their purpose is to protect the public. (*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 768-769 [physician discipline following misdemeanor conviction not designed to punish licensee but rather for public protection].)

Asset forfeiture laws have also been deemed civil in nature. (*25651 Minoa, supra,* 2 Cal.App.4th at pp. 795-797 [asset forfeiture provision not subject to prohibition against ex post facto laws].) "Most significant is that [asset forfeiture statutes], while perhaps having certain punitive aspects, serve important nonpunitive goals. . . . Requiring the forfeiture of property used to commit federal narcotics violations encourages property owners to take care in managing their property and ensures that they will not permit that property to be used for illegal purposes." (*United States v. Ursery* (1996) 518 U.S. 267, 290.) Similarly, the anti-fraud legislation at issue may have some punitive aspects, but it primarily serves important nonpunitive goals.

DISPOSITION

We decline the petitioner's request to issue a peremptory or alternative writ of mandate, prohibition, or other relief directing the WCAB to adjudicate the stayed liens

54

and not enforce the newly enacted anti-fraud legislation (§§ 4516 & 139.21). The parties are to bear their own costs associated with petitioning this court.


                                        O'LEARY, P. J.

WE CONCUR:


MOORE, J.


IKOLA, J.

Filed 10/19/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL E. BARRI et al., | |
| Petitioners, | |
| v. | G054838 |
| THE WORKERS' COMPENSATION APPEALS BOARD, | |
| | O R D E R |
| Respondent. | |

   The California Workers' Compensation Institute has requested that our opinion filed September 21, 2018, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c)(4), (c)(6), and (c)(7). The request is GRANTED.

   The opinion is ordered published in the Official Reports.

            O'LEARY, P. J.

WE CONCUR:

MOORE, J.

IKOLA, J.